UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Nosoud Alemarah,

       Plaintiff,                                Civil Action No. 17-CV-12639

vs.                                            HON. BERNARD A. FRIEDMAN

General Motors,

       Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS
## WASHTENAW COUNTY'S AND CORRECT CARE SOLUTIONS, LLC'S
## MOTIONS FOR SUMMARY JUDGMENT

       This matter is presently before the Court on the motions for summary judgment filed by defendants Washtenaw County and Correct Care Solutions, LLC [docket entries 39 and 41]. Plaintiff has filed responses in opposition, and defendants have replied. On March 6, 2019, a hearing was held and oral argument was heard. During the hearing, the Court ordered supplemental briefing, which the parties have submitted.

***Background***

       This is a § 1983 case involving allegations of sexual assault, battery, and harassment at a jail. Plaintiff was incarcerated at the Washtenaw County Jail (the "Jail") and alleges that on the evening of December 17, 2015, she was summoned to the medical clinic by defendant Percival Kuizon, a nurse at the Jail, although she had not requested an appointment. Compl. ¶ 15; Pl.'s Dep. at 32. According to plaintiff, Kuizon led her to an examination room that "was not recorded by camera." Compl. ¶ 16. Plaintiff states that Kuizon then kissed her without her consent and forced her to perform oral sex on him. *Id.* ¶¶ 17-18; Pl.'s Dep. at 31. No one else was in the room, such as a supervisor or a corrections officer. Pl.'s Dep. at 33; Kuizon Dep. at 52,

74; Holmes Dep. at 34-35; Kunath Dep. at 46-48; Casey Dep. at 35.  Kuizon was an employee of defendant Correct Care Solutions, LLC ("CCS"), a private entity that contracts with defendant Washtenaw County (the "County") to provide medical services at the Jail.  Def. Cty.'s Ex. 12.[1]

Prior to the incident at the medical clinic, Kuizon had winked and mouthed "I love you" to plaintiff at least ten times while passing out medications.  Pl.'s Dep. at 27-29.  Plaintiff testified that he did this to other inmates, "so I am pretty sure it was kind of known."  *Id.* at 28.  She characterized this behavior as "harmless."  *Id.*  After the incident, Kuizon "continue[d] to sexually assault and harass" plaintiff by sending her cards and letters.  Compl. ¶ 19; Pl.'s Dep. at 38.  Plaintiff never reported Kuizon's behavior or the clinic incident or his correspondence to anyone at the Jail.  Pl.'s Dep. at 27, 30, 33, 39, 75.  She testified that she had no knowledge of reports by other inmates regarding Kuizon's conduct while dispensing medications.  *Id.* at 75-76.  Kuizon does not dispute that a sexual encounter took place between him and plaintiff, but he states that plaintiff "initiated the whole engagement" and that he never forced himself on her.  Kuizon Dep. at 68-69.  He does not deny sending her cards and letters he signed with a pseudonym.  *Id.* at 89; Def. CCS's Ex. E.

The County and CCS learned about the December 17 incident between Kuizon and plaintiff on January 14, 2016, when a female inmate by the name of Ke-Ashia Collins disclosed it to a corrections officer.  Boivin Dep. at 34, 40; Def. CCS's Ex. B at 5.  The County immediately reported it to the Washtenaw County Sheriff's Office, which oversees the Jail, and the case was assigned to Detective Thomas Boivin.  Boivin Dep. at 33.  On the same day the incident was reported, Boivin interviewed Collins and plaintiff.  *Id.* at 40-41, 48; Def. CCS's Ex. B at 6-7.  He

---

[1] A copy of the contract between the County and CCS is attached to the County's motion for summary judgment as Exhibit 12.

attempted to interview Kuizon, but Kuizon refused to speak to him without an attorney.  Def. CCS's Ex. B at 5.  Boivin and a corrections officer then escorted Kuizon out of the building and revoked his security clearance.  Boivin Dep. at 73; Casey Dep. at 27; Holmes Dep. at 27-30; Def. CCS's Ex. B at 5.  CCS terminated Kuizon's employment effective the next day, January 15, 2016.  Kuizon Dep. at 73; Holmes Dep. at 26-27; Def. CCS's Ex. L (PageID.929).

Boivin conducted a criminal investigation and produced a written report that was forwarded to the prosecutor's office.  Boivin Dep. at 7-8; Def. CCS's Ex. B.  Kuizon was charged with second degree criminal sexual conduct and, after pleading no contest, sentenced to six months in jail and five years of probation.  Compl. ¶ 22; Kuizon Dep. at 70-71; Boivin Dep. at 69; Def. CCS's Ex. B at 20.  After the Sheriff's Office completed its criminal investigation, Sheriff's Captain Randy Casey, the deputy jail administrator, conducted a review of that office's policies.[2]  Casey Dep. at 9, 40; Kunath Dep. at 13.  He determined that there were no policy violations and no processes or procedures to improve.  Kunath Dep. at 14-15.

In August 2017, plaintiff filed this action against Kuizon, the County, CCS, and four unidentified corrections officers.  In Count I, plaintiff alleges that Kuizon violated her rights under the Fourth, Eighth, and Fourteenth Amendments.  Compl. ¶¶ 23-28.  In Count II, plaintiff asserts the same constitutional violations against the four unidentified corrections officers.[3]  *Id.* ¶¶ 29-39.  In Count III, plaintiff asserts a *Monell* claim against the County regarding its alleged failure

---

[2] Casey testified that he reviewed "Washtenaw County Sheriff's [O]ffice policies and procedures as they relate to professional conduct of the inmate population," including "inmate rights, our classification process, escort officer, [and] a few more that I'm not quite sure or remember."  Casey Dep. at 7.  He also reviewed the video evidence that had been provided to Boivin.  *Id.* at 39.

[3] On November 7, 2018, the Court entered a stipulated order that dismissed the four unidentified corrections officers from the complaint [docket entry 36].

to protect her from sexual assault, battery, and harassment, as well as its alleged failure to provide her with "prompt and immediate medical attention" for Methicillin-resistant Staphylococcus aureus ("MRSA"), a condition unrelated to the incident with Kuizon. *Id.* ¶¶ 40-46. In Count IV, plaintiff alleges that Kuizon committed sexual assault, battery, and harassment, for which CCS is vicariously liable. *Id.* ¶¶ 47-53. In Count V, plaintiff asserts state law claims of "negligence and/or gross negligence" against Kuizon and CCS. *Id.* ¶¶ 54-65. As to each count, plaintiff seeks damages over $75,000 excluding costs, interest, and attorney fees, along with punitive damages. *Id.* at 9, 12, 16, 18, 21. She alleges that defendants' actions caused her to suffer the following injuries: sexual assault and battery; sexual harassment; MRSA; severe emotional and mental distress; humiliation, grief, and embarrassment; loss of reputation and esteem in the community; fright and shock; inability to experience social pleasures and enjoyment; and "physical manifestations" such as shaky hands, nausea, increased anxiety, headaches, crying spells, nightmares, cold sweats, loss of appetite, and sleeplessness. *Id.* ¶¶ 26, 37, 44, 52, 65.

In November 2018, the County and CCS filed separate summary judgment motions. At the March 2019 hearing, summary judgment was granted for the County on the MRSA claim in Count III and for CCS on the vicarious liability claim in Count IV. For the reasons explained below, the Court shall now grant summary judgment for the County on the remainder of Count III and for CCS on Count V.

***Legal Standard***

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See id.* at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

## *Discussion*

## **Count III** – *Monell* Claim Against Washtenaw County

In Count III, plaintiff asserts a municipal liability claim against the County under *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658 (1978), on the grounds that it (1) failed to properly screen its "contractors/employees," (2) failed to adopt policies, procedures, regulations, and/or customs to monitor and protect inmates, (3) failed to adequately train and supervise its "contractors/employees and/or officers," and (4) failed to fully investigate, discipline, and retrain any "contractors/employees and/or officers" who did not comply with its policies, procedures, regulations, and/or customs. Compl. ¶ 43. Plaintiff appears not to disagree with the fact that Kuizon was an employee of CCS and not the County. The County argues that it is entitled to summary judgment on Count III because "no reasonable jury could find that the County

maintained an official custom with the force of law that rose to the level of 'deliberate indifference' and that caused the alleged constitutional deprivation in dispute."[4]  Def. Cty.'s Br. at 15.

"[T]o impose § 1983 liability on a municipality, the plaintiff must prove that the constitutional deprivation occurred as a result of an official custom or policy of the municipality." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (internal citation omitted).  The "custom or policy must be the 'moving force' behind the constitutional violation"; the plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (internal quotations omitted).  In other words, the plaintiff "must establish that the county's official policies or customs (or lack thereof) were a 'moving force' behind the deprivation of Plaintiff's rights and arose as a result of 'deliberate indifference' to her rights." *Balbridge v. Jeffreys*, No. 07-CV-15130-DT, 2009 WL 275669, at *4 (E.D. Mich. Feb. 5, 2009) (quoting *Doe v. Claiborne Cty.*, 103 F.3d 495, 508 (6th Cir. 1996)).  Thus, the alleged injury must have been caused by the municipality "through its *deliberate* conduct." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 399 (1997) (emphasis in original).

---

[4] The County argues that the dismissal of the complaint as to the four unnamed corrections officers is "an independent basis supporting summary judgment." Def. Cty.'s Br. at 12 n.10.  The County cites to a line in *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001), which says that "[i]f no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." *Id.*  But the Sixth Circuit, in considering this issue more recently, stated that "other cases from this circuit have indicated that the principle might have a narrower application." *Winkler v. Madison Cty.*, 893 F.3d 877, 900 (6th Cir. 2018).  It also recognized that "several other circuits have considered [*City of Los Angeles v. Heller*, 475 U.S. 796 (1986)] and concluded that a municipality may be held liable under § 1983 in certain cases where no individual liability is shown." *Winkler*, 893 F.3d at 900-01 (collecting cases).  The Sixth Circuit found it unnecessary in that case to decide "whether, under our court's precedent, a municipality's liability under § 1983 is always contingent on a finding that an individual defendant is liable for having committed a constitutional violation." *Id.* at 901.  The Court need not decide the issue in the present case either because the County is entitled to summary judgment on the merits, for the reasons discussed below.

## 1. Failure to Screen

Plaintiff alleges that the County "[f]ailed to screen and staff the jail with noncriminal contractors/employees and/or contractors/employees without a propensity to sexually assault and harass the female inmates." Compl. ¶ 43(a). Plaintiff takes issue with the County requiring corrections officers, but not male nurses who work at the Jail, to undergo a psychological evaluation. Pl.'s Resp. at 19. She also faults the County for not interviewing Kuizon before he was allowed to begin working at the Jail. *Id.* at 21; Pl.'s Suppl. Br. at 6.

In addressing a municipal liability claim premised on inadequate scrutiny of an applicant's background, the Supreme Court in *Brown* determined that

> [a] plaintiff must demonstrate that a municipal decision [to hire an applicant] reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision. Only where adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right can the official's failure to adequately scrutinize the applicant's background constitute "deliberate indifference."

520 U.S. at 411 (alterations added). The Court stated that "a finding of culpability simply cannot depend on the mere probability that any [applicant] inadequately screened will inflict any constitutional injury. Rather, it must depend on a finding that *this* [applicant] was highly likely to inflict the *particular* injury suffered by the plaintiff." *Id.* at 412 (alterations added) (emphasis in original). Applying *Brown* to a failure-to-screen claim, the Sixth Circuit concluded that a county was not liable under § 1983 for its alleged "policy of not checking the criminal backgrounds of the individuals it hired" where an officer's "domestic violence charges and protection orders 'may well have made him an extremely poor candidate for . . . deputy,'" but "Plaintiffs cannot show that these shortcomings made it 'highly likely' that he would 'inflict the *particular* injury suffered by

[them].'" *Siler v. Webber*, 443 F. App'x 50, 56 (6th Cir. 2011) (emphasis in original) (quoting *Brown*, 520 U.S. at 412).

In the present case, plaintiff's failure-to-screen claim fails because she has not shown that it was "plainly obvious" that Kuizon was "highly likely" to inflict the particular injuries she sustained. *Brown*, 520 U.S. at 411-12. Although plaintiff argues that the County should have required Kuizon to take a psychological evaluation and that it should have interviewed him, she provides no evidence that these additional steps would have made the County aware of the risk that Kuizon would inflict the specific type of harm that he did. Kuizon was employed by CCS – not the County – and CCS hired him after he participated in a phone interview. Kuizon Dep. at 24-25. The County did subject Kuizon to a criminal background check, which he passed.[5] Def. Cty.'s Ex. 6; Kuizon Dep. at 92; Holmes Dep. at 71-72. And according to Kuizon, at his prior job as a CCS nurse at a jail in California he did not have problems with inmates, discipline, or his nursing license. Kuizon Dep. at 34-35. As plaintiff has not challenged this testimony or provided any other evidence of "red flags" in Kuizon's past, she has failed to show that the County would have found reason to disqualify Kuizon had it probed more deeply into his background or into his psychological state. Thus, plaintiff has not shown that the County is liable because she has not demonstrated that Kuizon was "highly likely to inflict the *particular* injury suffered by [her]." *Brown*, 520 U.S. at 412.

---

[5] The criminal background check is "a wants-and-warrants check" that searches jail and court records on a local and national level through databases such as "CLEMIS," "XJail," and "Odyssey." Kunath Dep. at 32. The County's contract with CCS required all CCS staff to pass a criminal background check through the Sheriff's Office. Def. Cty.'s Ex. 12 (PageID.423).

## 2. *Failure to Adopt Policies, Procedures, Regulations, and/or Customs*

Plaintiff also alleges that the County failed to adopt policies, procedures, regulations, and/or customs "to protect its inmates from sexual assault and battery"; "to monitor and/or adequately monitor inmates to ensure the well being [sic] of each inmate, specifically [plaintiff]"; and to "monitor and/or adequately monitor" the inmates' well-being using the Jail's audio/visual system and "within the areas not equipped with audio/visual equipment." Compl. ¶ 43(b), (e)-(g). Plaintiff especially takes issue with the alleged absence of "policies . . . to protect female inmates from the male contractors," such as "policies or procedures prohibiting a male nurse and/or contractor from being left alone with a female inmate." Pl.'s Resp. at 15; Pl.'s Suppl. Br. at 5.

Despite these allegations, the evidence shows that the County did have policies that protected inmates, including ones that seek to protect them from sexual assault and battery and ensure their well-being. The County's "Inmate Rights" policy provided:

III. POLICY

    A. The Washtenaw County Sheriff's Correctional Facility shall establish and maintain written policies that will protect the rights of inmates while incarcerated.

    B. Employees shall not mistreat persons who are in their custody.

    C. Employees shall handle persons in custody in accordance with the law[6] and Sheriff's Office procedures.

        1. Mistreatment of persons in custody can include non-physical acts such as withholding a privilege or right that is guaranteed to the inmate without due process.

---

[6] "[I]t is undisputed that it is against Michigan law for police officers to engage in sexual relations with inmates in their custody." *Balbridge v. Jeffreys*, No. 07-CV-15130-DT, 2009 WL 275669, at *6 (E.D. Mich. Feb. 5, 2009) (citing Mich. Comp. Laws § 750.520c(1)(k)).

2. Discipline of persons in custody shall be in accordance with rules of due process.

3. A written record of all discipline shall be maintained.

4. An inmate shall receive a copy of all discipline against him/her and be informed of his/her right to appeal through a higher-ranking supervisor.

***

E. The Sheriff's Office will establish a formal procedure for an inmate to grieve discipline and other problems.

***

V. COMPLIANCE

A. All employees shall comply with all provisions of this policy and procedure. A violation of any section of this policy is a Class 2 offense and may result in corrective discipline.

B. A violation of this policy and procedure may also be a violation of other Sheriff's Office Professional Standards, which may result in corrective disciplinary action up to and including discharge.

Def. Cty.'s Ex. 11 (PageID.405). The County also had policies to ensure that inmates received prompt emergency and non-emergency medical treatment. *Id.* (PageID.407-11).

The County's "Professional Conduct" policy also protected the rights of inmates. The professional conduct standards in this policy included:

1. Employees shall conduct themselves at all times, both on and off duty, in such a manner as to reflect most favorably on the department. No employee shall engage in conduct that may bring the department into disrepute or reflects discredit upon the employee as a member of the department, or that would disrupt the operation or efficiency of the department or the employee.

2. Employees shall maintain a level of moral conduct in their personal and business affairs, which is in keeping with the highest standards of the law enforcement profession. Employees shall not participate in any incident involving moral turpitude, which impairs their ability to perform as a Sheriff Department employee.

3. A violation of this professional conduct standard is a Class 1 offense.

4. Employees should always be aware of the high standard to which public employees are held. Insofar as it is fashionable to attack the integrity of those in public service, the need to avoid even the appearance of impropriety is maximized.

5. In addition to these professional standards being illustrative of "the highest standards of the law enforcement profession," meaning to this phrase may be found in the following Law Enforcement Code of Ethics:

   a. "AS A LAW ENFORCEMENT OFFICER, my fundamental duty is to serve mankind; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation, and the peaceful against violence or disorder; and to respect the Constitutional rights of all persons to liberty, equality, and justice.

   b. I WILL keep my private life unsullied as an example to all; maintain courageous calm in the face of danger, scorn, or ridicule; develop self-restraint; and be constantly mindful of the welfare of others. Honest in thought and deed in both my personal and official life. I will be exemplary in obeying the laws of the land and the regulations of my department. . . .

   c. I WILL never act officiously or permit personal feelings, prejudices, animosities, or friendships to influence my decisions. With no compromise for crime and with relentless prosecution of criminals, I will enforce the law courteously and appropriately without fear or favor, malice or ill will, never employing unnecessary force or violence and never accepting gratuities.

   d. I RECOGNIZE the badge of my office as a symbol of public faith, and I accept it as a public trust to be held as long as I am true to the ethics of police service. I will constantly strive to achieve these objectives and ideals, dedicating myself before God to my chosen profession."

*Id.* (PageID.386-87) (emphasis in original). In addition, the "Professional Conduct" policy required employees to "obey all laws of the United States and of any state and local jurisdiction in which the employees are present." *Id.* (PageID.388). It also forbade employees from engaging

"in any activities or personal business which would cause them to neglect or be inattentive to duty." *Id.*

As to the treatment of inmates, the policy provided:

1. Employees shall not mistreat persons who are in their custody. Employees shall handle such persons in accordance with law and departmental procedures.

2. It is to be noted that mistreatment can be non-physical, such as withholding a privilege or right that is guaranteed to a prisoner.

3. A violation of this professional conduct standard is a Class 1 offense.

*Id.* (PageID.390). The policy required employees to be "tactful in the performance of their duties" and did not allow "coarse, violent, profane or insolent language or gestures." *Id.* (PageID.391). Employees were to "exercise the utmost patience and discretion." *Id.* The policy prohibited employees from using their official position for "[o]btaining privileges not otherwise available to them except in the performance of duty," and they were to scrutinize any gifts, gratuities, bribes, and awards with "heightened awareness." *Id.* (PageID.393-94).

Under the County's policies, the sexual assault, battery, and harassment of an inmate was an offense punishable by disciplinary action. It was also an offense under the County's "Jail Rules and Regulations," which all inmates were required to observe. These rules and regulations were "established to assist in assuring all residents a sanitary, safe and secure corrections environment" and provided that "[a]ny sexual misconduct or criminal act . . . is prohibited and will result in criminal prosecution." *Id.* (PageID.412-13). "Major Offenses" included "an offense prohibited or punishable by State Law" and "Sexual Misconduct." *Id.* (PageID.412).

In addition to having its own policies that protected inmates and ensured their well-being, the County reviewed and approved CCS's policies, including ones that prohibited sexual

assault, battery, and harassment.  Def. Cty.'s Ex. 12 (PageID.423); Kunath Dep. at 21, 31; Holmes

Dep. at 33, 45.  CCS had a written "zero tolerance policy with regard to sexual abuse, sexual

harassment and sexual misconduct."  Def. Cty.'s Ex. 8 (PageID.355).  This policy applied "to all

health care staff, and patients" and provided:

> All allegations of sexual abuse, sexual harassment and sexual misconduct
> with or without consent or staff voyeurism will be promptly and thoroughly
> reported to the Facility Administration and will be handled in compliance
> with federal law.
>
> Sexual misconduct by an employee with a person committed to the custody
> of the facility, whether it occurs inside of the facility, during transportation
> outside of the facility or at any other time during a patient's custody is
> strictly prohibited.  An employee who engages in sexual misconduct,
> including sexual contact with a patient is subject to termination.
>
> CCS prohibits employees from indulging in any undue familiarity with
> patients or permitting undue familiarity on the part of the patient towards
> themselves, regardless of marital status.  Any sexual abuse of a patient by a
> staff member will result in severe disciplinary action and will be prosecuted
> to the fullest extent of the law.  Employees also face registration as a sex
> offender and may be held financially liable and not indemnified by the
> facility or CCS if sued as a result of their actions.

*Id.*  The procedures for implementing this policy included an employee training on the 2003 Prison

Rape Elimination Act ("PREA"), a mandatory reporting requirement for employees, and providing

inmates with information on the PREA at their initial medical screening.  *Id.* (PageID.355-56).  A

different written policy established an orientation program for all newly-employed health staff that

covered topics such as "Inmate/Staff relationships" and "Appropriate conduct with patients."  *Id.*

(PageID.352-54).  CCS's Team Member Manual explicitly forbade sexual abuse, sexual

harassment, sexual misconduct, and fraternization between CCS staff and inmates, Def. CCS's Ex.

L (PageID.952, 957-58) and Ex. N at 5, 32, and it was protocol that "CCS staff . . . not . . . be alone

with an inmate at any time in the medical room."[7]  Boivin Dep. at 63.  Further, CCS had a written

policy that gave inmates the right to communicate concerns regarding "health treatment and

services" through a grievance mechanism.  Def. Cty.'s Ex. 8 (PageID.368-69).

Regardless of these existing policies, plaintiff argues that the County is liable

because it did not have specific policies that ensured the proper monitoring of inmates and that

prevented male nurses from being alone with female inmates at the clinic, including policies that

prevented male nurses from calling female inmates to the clinic at night, "for no reason," and in

an unscheduled fashion.  Compl. ¶ 43(f)-(g); Pl.'s Resp. at 18-19.  But this Court has stated that

> [t]he proper focus [for determining whether the failure to provide for a
> specific procedure amounts to a constitutional violation] is not on what the
> policy could have been, ideally, but what the policy actually was.  The
> Constitution, of course, does not require perfection.  *See Graham v. County
> of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004) ("Graham's argument is
> essentially that the County's policy did not, in this particular case,
> adequately address Mr. Graham's specific medical needs.  That may be so.
> However, '[t]he fact that alternative procedures might have better addressed
> [a prisoner's] particular needs does not show that the [County was]
> deliberately indifferent to his medical needs.'" (citation and footnote
> omitted)).

*Balbridge*, 2009 WL 275669, at *5.  That is to say, the issue in a case such as this is not whether

defendant could have adopted other or better or more policies, but whether the policies in place

were constitutionally deficient.

In *Balbridge*, the plaintiff was a pre-trial detainee who was sexually assaulted by a

deputy sheriff who supervised her at a hospital, and her claim against the county involved its failure

---

[7] Boivin testified that he discovered this protocol during his investigation, and he concluded that Kuizon was therefore "violating protocol by being alone with [plaintiff] in the medical room." Boivin Dep. at 63, 65.  He made this finding in his written report.  Def. CCS's Ex. B at 13. Kathleen Holmes, CCS's medical supervisor at the Jail, testified that she "often" told CCS employees that "no male or female staff should ever be alone with an inmate," and she believed this prohibition was "just understood."  Holmes Dep. at 36-37.

to have policies and procedures that specifically addressed the supervision of female inmates off-site "to protect against custodial sexual misconduct." *Id.* The Court found

> as a matter of law that no further specificity was required. In order to impose liability, "the risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752-53 (6th Cir. 2006) (citation omitted). In this case, there is no evidence of any prior complaint of Defendant Jeffreys's behavior, nor indeed is there any evidence of a pattern of complaints about any deputy. *Contra Tafoya v. Salazar*, 516 F.3d 912 (10th Cir. 2002) (cited by Plaintiff, Pl.'s Resp. at 16) (finding triable issue because Sheriff should have been on notice of inappropriate behavior based on previous assaults and previous lawsuit); *Kahle v. Leonard*, 477 F.3d 544 (8th Cir. 2007) (cited by Plaintiff, Pl.'s Resp. at 16-17) (finding triable issue where jury could find that prison official knew or should have known of the assault). Rather, in order to find a triable issue, the court must find that any time a male guard supervises a female inmate, or a female inmate with a known or unknown history of sexual abuse, that inmate is at risk of being assaulted by the prison guard. Even more, the court must find that a reasonable jury could conclude that the risk is so great that it constitutes deliberate indifference for a municipality to not have a policy specifically prohibiting this conduct while guarding off-site. The court cannot sustain this position.

*Id.* at *6. The Court went on to

> find[] as a matter of law that the Jackson County's policies, or failure to promulgate a specific policy governing the off-site, cross-gender supervision does not constitute deliberate indifference. Based on the facts presented to the court, Plaintiff could not establish that the County's official policies or customs (or lack thereof) were a "moving force" behind the deprivation of Plaintiff's rights and arose as a result of "deliberate indifference" to her rights. *See Doe*, 103 F.3d at 508.

*Id.* at *8.

Like the plaintiff in *Balbridge*, the plaintiff in the present case has not established that the County's failure to have certain policies constituted deliberate indifference. Plaintiff does not show that the absence of the specific policies she calls for regarding the monitoring of inmates and the prevention of unsupervised inmate visits to the clinic created an unreasonably high risk that a female inmate would be sexually mistreated any time she was seen by a male nurse. The

record contains no evidence of prior complaints or grievances against any male nurses or CCS employees at the Jail, including Kuizon, and no evidence of a pattern of sexual misconduct between male nurses and female inmates at the Jail. Thus, it was not "plainly obvious" that the alleged defects in the County's policy would result in the harm plaintiff suffered and the risk of sexual assault, battery, and harassment to female inmates by male nurses. No reasonable jury could conclude that the County was deliberately indifferent to this risk.

### 3. Failure to Adequately Train and Supervise

Plaintiff further alleges that the County failed to train and supervise "its contractors/employees and/or officers to ensure the proper execution of policies, procedures, regulations, and/or customs" to protect inmates from sexual assault and battery, ensure their well-being, and protect their constitutional rights. Compl. ¶ 43(c), (h)-(k). The County argues that it is entitled to summary judgment on this claim because Kuizon did receive training from the County and CCS, and he "understood sexual relations with inmates [were] prohibited." Def. Cty.'s Br. at 22; Def. Cty.'s Suppl. Br. at 8-9. The County also argues that plaintiff has not presented evidence of a "'clear and persistent pattern' of sexual assaults on inmates," Def. Cty.'s Br. at 15, and that even if the County "had a duty to supervise Kuizon (as opposed to his employer[,] CCS)," plaintiff has not shown that "the County's deliberate indifference caused the sexual contact." *Id.* at 23.

To succeed on a claim of inadequate training or supervision, a plaintiff "must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a

municipal actor disregarded a known or obvious consequence of his action." *Scott v. Genesee Cty.*, No. 14-CV-11557, 2015 WL 7889037, at *6 (E.D. Mich. Dec. 4, 2015) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Deliberate indifference can be shown

> "where the [county] fails to act in response to repeated complaints of constitutional violations by its [employees or contractors]," *id.* at 903 (quoting *Ellis*, 455 F.3d at 700-01), or through "'a single violation of federal rights, accompanied by a showing that [the county] has failed to train its employees [or contractors] to handle recurring situations presenting an obvious potential' for a constitutional violation," *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738-39 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 409 (1997)).

*Gordon v. Bierenga*, No. 18-CV-13834, 2019 WL 2205853, at *2 (E.D. Mich. May 22, 2019) (alterations added).

> In reviewing a claim alleging a failure to train or supervise,
>
> [t]he focus of the court's inquiry is on the training program itself and testimony that shows individual [employees or contractors] did not have specific training, standing alone, is insufficient to defeat summary judgment. *City of Canton*, 489 U.S. at 390-91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."). Moreover, it is not enough for a plaintiff "to show that his injury could have been avoided if the [employee or contractor] had had more or better training." *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999).

*Balbridge*, 2009 WL 275669, at *8 (alterations added).

Plaintiff argues that the County is liable for its failure to train and supervise because Kuizon testified that he was not, and did not recall being, trained by the County; was not provided with a copy of the County's policies; and was not familiar with the PREA. Pl.'s Resp. at 14-15; Pl.'s Suppl. Br. at 4-5. Plaintiff also relies on the testimony of Captain Randy Casey, the deputy jail administrator, that the County does not directly supervise CCS employees but indirectly supervises them through meetings with CCS's health care director, and the testimony of

Commander Eric Kunath, the jail administrator, that the County does not train CCS's staff, provide them with any policies, produce "documents relating to any violations or any problems with CCS," or ensure that a CCS staff member has a "valid reason" for calling an inmate to the medical clinic. Pl.'s Resp. at 14-15; Pl.'s Suppl. Br. at 4-6; Casey Dep. at 29-30; Kunath Dep. at 41, 45, 50-51.

Kuizon's testimony regarding his alleged lack of training, on its own, "is insufficient to defeat summary judgment." *Balbridge*, 2009 WL 275669, at *8. Even viewing all of the evidence in a light most favorable to plaintiff, plaintiff's claim fails because she has not made the necessary showing of deliberate indifference by the County. A reasonable jury could not find that the County ignored "repeated complaints of constitutional violations" by the County's employees or contractors. *Gordon*, 2019 WL 2205853, at *2. The County became aware of Kuizon's conduct when an inmate reported the incident to a corrections officer in January 2016; prior to that, no complaints were made regarding Kuizon[8] or any other CCS employee.[9] Pl.'s Dep. at 33, 39, 75; Kuizon Dep. at 44, 82; Holmes Dep. at 39, 64-65. The only other incident of sexual misconduct at the Jail involved a corrections officer in 2015, and that officer was suspended, convicted, and terminated. Kunath Dep. at 52; Casey Dep. at 37-38. This one incident is insufficient to show that there were repeated complaints of constitutional violations that the County was aware of and disregarded. *See Mize v. Tedford*, 375 F. App'x 497, 501 (6th Cir. 2010) (finding that a police department "did not have a pattern of sexual assaults by its officers, as the preceding

---

[8] Plaintiff points to allegations made by other inmates regarding Kuizon's inappropriate behavior towards them, but plaintiff herself recognizes that these allegations first surfaced during the County's criminal investigation after Kuizon was terminated from the Jail. Pl.'s Suppl. Br. at 7.

[9] In her supplemental brief, plaintiff states that "there appear[] to have been over 52 federal lawsuits filed against Correct Care Solutions relating to the lack of care and treatment of inmates from 2014 through 2018." Pl.'s Suppl. Br. at 7. But plaintiff does not disclose the source of this statistic or explain its relevance to this case.

two decades saw no more than a handful of sexual-assault allegations against its officers" and therefore affirming summary judgment for a city on a failure-to-supervise claim because there was no showing of deliberate indifference).

The Sixth Circuit explained in *Pecsi v. City of Niles*, 674 F. App'x 544, 547 (6th Cir. 2017), that where a pattern of constitutional violations that would give a municipality notice "of the need for closer supervision" is lacking, "[t]he duty to supervise is not a duty to micromanage. A municipality does not open itself up to liability every time it delegates power to employees." The court in *Pecsi* recognized that the city gave its employee the "opportunity" to abuse the plaintiff but determined that "'[o]pportunity alone, without reason to suspect that it will lead to a constitutional violation, does not establish deliberate indifference.'" *Id.* (quoting *Mize*, 375 F. App'x at 501). In the present case, plaintiff has not established that the County acted with deliberate indifference, as opposed to merely giving Kuizon, who was employed by CCS, an "opportunity" to inflict harm "without reason to suspect that it will lead to a constitutional violation." *Id.*

Nor could a reasonable jury conclude that it should have been obvious that the County's alleged failure to train and supervise would cause plaintiff's injury. That Kuizon, a CCS employee, would sexually mistreat an inmate was not an obvious consequence of any failure of the County to train and supervise its "its contractors/employees and/or officers," *see Balbridge*, 2009 WL 275669, at *8 n.10 (finding it "difficult to imagine how any lack of training led to a violent, criminal attack"); *see also Siler*, 443 F. App'x at 55 ("Our precedent confirms that '[t]he intentional, violent act that a [police officer] performed far outside the scope of his duties cannot be something that was 'obvious' to occur.'" (quoting *Mize*, 375 F. App'x at 501)), especially given the County's and CCS's policies forbidding such misconduct and the lack of inmate complaints.

*See Balbridge*, 2009 WL 275669, at *9 (granting summary judgment for a county because its "policies were sufficient to proscribe the conduct which caused Plaintiff's injuries" and there was "nothing in the record to support a jury finding that it was foreseeable that a male guard would sexually assault a female inmate while supervising her off-site" and there was no "evidence that the County failed to train its employees in response to repeated (or singular) complaints of sexual behavior").

### 4. *Failure to Investigate, Discipline, and Retrain*

Finally, plaintiff alleges that the County is liable for its failure "to fully investigate and/or discipline and/or retrain its contractors/employees and/or officers who do not abide by its policies, procedures, regulations and/or customs, if any, relative to . . . providing for the protection of inmates from sexual assault and battery." Compl. ¶ 43(l). However, the record reflects that the County did investigate noncompliance with its policies regarding sexual assault and battery and that noncompliant employees and contractors were disciplined.[10] Plaintiff's challenge appears to be that no one from the County or CCS conducted an investigation to determine whether CCS's policies had been violated. Pl.'s Resp. at 19; Pl.'s Suppl. Br. at 7. She also highlights Boivin's testimony that he was unaware of how the County collected data on complaints of sexual assault and harassment at the Jail, if at all, Pl.'s Suppl. Br. at 8; Boivin Dep. at 37-38, and Kunath's testimony that the County did not discipline CCS employees. Pl.'s Suppl. Br. at 6; Kunath Dep. at 42-43.

---

[10] As discussed above, the County conducted a criminal investigation and an internal investigation when Kuizon's misconduct came to light. Moreover, the County had previously disciplined a corrections officer who committed sexual misconduct. With respect to Kuizon, the County immediately escorted him out of the building and revoked his security clearance, and it gave Boivin's written report to the prosecutor's office to assist in Kuizon's criminal case.

Plaintiff's claim against the County fails because she does not identify a policy or custom of the County that caused her alleged injuries. "Municipal liability attaches only where the policy or practice in question is 'attributable to the municipality.'" *D'Ambrosio v. Marino*, 747 F.3d 378, 387 (6th Cir. 2014) (quoting *Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012)). Plaintiff identifies no policy attributable to the County regarding the County's alleged failure to investigate, discipline, and retrain. As a result, these alleged failures provide no basis for finding the County liable.

Moreover, plaintiff's claim fails even if is construed as an argument that the County had a custom or policy of "inaction."

> To prevail on . . . an "inaction theory," where a policy of tolerating federal rights violations is allegedly unwritten but entrenched, plaintiff must show: (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of the defendants; (3) defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and (4) that defendants' custom was the "moving force" or direct causal link in the constitutional deprivation. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005); *Doe v. Claiborne County*, 103 F.3d at 508. The evidence must show that the need to act was so obvious that defendants' conscious decision not to act can be said to amount to a "policy" of deliberate indifference to plaintiff's constitutional rights. *Id.* "'Deliberate indifference' in this context does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference to sexual abuse." *Id.*

*Reinhardt v. Dennis*, 399 F. Supp. 2d 803, 807 (W.D. Mich. 2005). As noted above, plaintiff has not established that there was a pattern of sexual assault, battery, or harassment at the Jail of which the County had notice and tacitly approved. Further, there is no indication that the County's alleged failure to investigate, discipline, and retrain caused plaintiff's injuries. The issue before the Court is whether the County's actions (or inactions) were constitutionally deficient, and plaintiff has presented no evidence from which a jury could find in her favor as to this defendant.

In sum, the County is entitled to summary judgment on Count III because a reasonable jury viewing the evidence in a light most favorable to plaintiff could not find that the County was deliberately indifferent to plaintiff's rights or to the possibility that an inmate might be sexually abused by an employer or contractor of the County.

**Count V** – Negligence and Gross Negligence Claims Against CCS

In Count V, plaintiff asserts state law claims of "negligence and/or gross negligence" against Kuizon and CCS.[11] As to CCS, plaintiff alleges that it owed her, and breached, the following duties: (1) to provide her with medical services "and not to assault, batter and harass" her, (2) to ensure that its employees and agents at the Jail did not assault, batter, and harass her, and (3) to screen, train, monitor, and supervise its employees and agents who worked at the Jail.[12] Compl. ¶¶ 56-61. Plaintiff claims that CCS's "negligent actions" and "grossly negligent actions" proximately caused her numerous physical and psychological injuries. *Id.* ¶¶ 62-63. For the reasons explained below, the Court finds that CCS is entitled to summary judgment on plaintiff's claims of negligence and gross negligence.[13]

---

[11] In Count V, plaintiff also asserts that CCS "is vicariously liable under the doctrine of respondeat superior for all acts committed by employee [Kuizon] when acting within the course and scope of his employment." Compl. ¶ 64. But plaintiff cannot hold CCS liable under respondeat superior because it is a private entity performing a traditional state function. *See Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014).

[12] In her response to CCS's motion, plaintiff argues that CCS is also "liable for the negligence and/or gross negligence of its employees in the failure to care and treat [her] MRSA." Pl.'s Resp. at 23. But in Count V of the complaint, plaintiff does not take issue with the medical care that CCS provided to her at the Jail. Compl. ¶¶ 54-65. Rather, her negligence and gross negligence claims have to do with CCS's alleged failure to prevent, or its failure to protect plaintiff from, sexual assault, battery, and harassment. *Id.*

[13] In addition to challenging plaintiff's negligence and gross negligence claims, CCS seeks summary judgment on the grounds that plaintiff fails to assert a *Monell* claim against it. But at the hearing, plaintiff clarified that she is not asserting a *Monell* claim against CCS. Hr'g Tr. at 31.

*1. Negligence*

Plaintiff argues that CCS was negligent because it failed to train, monitor, and supervise Kuizon even though "it was foreseeable that harm would come to a female inmate in this exact situation," i.e., when a female inmate is left alone with a male nurse. Pl.'s Resp. at 16-18, 20-21. In support of this argument, plaintiff points to Kuizon's inability to recall the training given to him by CCS and his alleged history of inappropriate conduct at the Jail, including "that [he] had previously assaulted a female inmate and was assaulting another female inmate . . . during the same time he was assaulting Ms. Campbell in the medical clinic when they had not requested appointments and were not on the schedule." *Id.* at 16-19. Plaintiff claims that CCS is liable because it "turned a blind eye" to Kuizon's actions. *Id.* at 17. Plaintiff also argues that CCS is liable because it did not require Kuizon to undergo a psychological evaluation, did not speak to his former supervisor or review his personnel file at his prior job in California, and did not have a supervisor on-site on the evening of the incident, despite the earlier incident involving the corrections officer. Pl.'s Suppl. Br. at 8.

"To establish a prima facie case of negligence under Michigan law, a plaintiff must establish (1) that a duty existed; (2) that the duty was breached; (3) causation between the breach and the injury; and (4) damages." *Cleveland Indians Baseball Co., L.P. v. N.H. Ins. Co.*, 727 F.3d 633, 638 (6th Cir. 2013) (citing *Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 556 (Mich. 2011)). "The threshold question in a negligence action is whether the defendant owed a duty to the plaintiff." *Brown v. Brown*, 739 N.W.2d 313, 317 (Mich. 2007) (footnote omitted). "In determining whether a duty exists, Michigan courts review the foreseeability of the harm to the plaintiff." *Sparks v. Bellin Health Sys., Inc.*, No. 2:09-CV-14, 2010 WL 2349467, at *10 (W.D. Mich. June 7, 2010) (citing *Brown*, 739 N.W.2d at 317). Foreseeability of the harm is one of the

factors that is "necessary, though insufficient, for the court to find the existence of a duty." *LSS Kammo, LLC v. Ecolab Inc.*, No. 10-10923, 2010 WL 5148680, at *3 (E.D. Mich. Dec. 14, 2010) (citing *In re Certified Question from Fourteenth Dist. Ct. of App. of Tex.*, 740 N.W.2d 206, 213 (Mich. 2007)). "[F]oreseeability 'depends upon whether or not a reasonable man could anticipate that a given event might occur under certain conditions.'" *Id.* (quoting *Moore v. Sky Chefs, Inc.*, 79 F. App'x 130, 135 (6th Cir. 2003)).

A review of the evidence indicates that Kuizon's conduct, and the resulting harm to plaintiff, were not reasonably foreseeable. Like all CCS employees working at the Jail, Kuizon passed a background check. Kuizon Dep. at 39-41, 84, 92; Casey Dep. at 23; Holmes Dep. at 71-72; Def. CCS's Ex L (PageID.932-33). Kathleen Holmes, a CCS employee who oversaw the Jail's medical functions and Kuizon's supervisor, verified that his license was current. Holmes Dep. at 42. In October 2015, CCS conducted a ninety-day evaluation of Kuizon's performance and found that it met CCS's standards. Def. CCS's Ex. L (PageID.941-43).

At his prior job in California Kuizon had no problems, was not the subject of an internal affairs investigation, was not disciplined, and did not receive complaints from inmates. Kuizon Dep. at 34. No complaints were made to the nursing board in California, and his license was never revoked or suspended. *Id.* at 35. Kuizon received no complaints from inmates at the Jail either, and prior to the incident with plaintiff, he was never involved in any internal affairs or county investigations. *Id.* at 44. Holmes testified that she never had to discipline Kuizon. Holmes Dep. at 31. Before the incident in question she never received complaints, concerns, or negative reports regarding Kuizon from others at the Jail or CCS. *Id.* at 39, 64-65. She testified that plaintiff "never submitted a kite complaining of inappropriate behavior by any CCS staff member at [the Jail], including but not limited to Mr. Kuizon." Def. CCS's Ex. O ¶ 21. Holmes was unaware of

Kuizon's conduct towards plaintiff and stated that she "never observed nor was I informed that Mr. Kuizon or any other CCS staff member [at the Jail] had engaged in any conduct, fraternization or sexual harassment concerning [plaintiff]." *Id.* ¶¶ 16-19. Plaintiff has offered no evidence to the contrary on these points.

In addition to having a clear background and employment history, the evidence indicates that as a CCS employee Kuizon participated in CCS trainings and received CCS's written policies and Team Member Manual, Kuizon Dep. at 26-28, 80, 85-86; Holmes Dep. at 72-74; Def. CCS's Ex. L (PageID.952, 957-58)[14] and Ex. N at 5, 32, which explicitly forbade sexual abuse, sexual harassment, sexual misconduct, and fraternization between CCS staff and inmates, as noted above. Def. Cty.'s Ex. 8; Def. CCS's Ex. L (PageID.952, 957-58) and Ex. N at 5, 32. Although Kuizon testified that he did not know what the PREA was and did not recall being trained or certified on it, Kuizon Dep. at 30-32, 81, there is evidence that Kuizon attended a training led by Holmes that covered CCS's policies and procedures, as well as the PREA. Holmes Dep. at 31-33, 59, 63-64; Def. CCS's Ex. K. There is also evidence that Kuizon completed online courses on the PREA in July 2015 and January 2016. Def. CCS's Ex. J. During his deposition, Kuizon testified that he knew that it was against CCS's "rules and regulations to have any contact with inmates." Kuizon Dep. at 64. He understood this meant that "any contact with a person touching you" or "any means of touching" was not allowed. *Id.* at 81. He stated that he "became aware" of this prohibition through a CCS training, *id.* at 80, and he testified that he "actively conceal[ed]" his interactions with plaintiff from CCS because he was afraid that he would get fired. *Id.* at 82. He

---

[14] These documents in Kuizon's personnel file show that on December 8, 2014, he acknowledged receipt of CCS's policies and Team Member Manual by signing two written acknowledgements to that effect. By signing the Team Member Manual Acknowledgement, Kuizon accepted its terms "and agree[d] to comply with all of the policies and procedures contained in it, along with any revisions." Def. CCS's Ex. L (PageID.958).

also testified that he used a pseudonym on the cards and letters he sent to plaintiff because he "didn't want to get in trouble by the authorities." *Id.* at 89.

Given Kuizon's clean criminal background, employment history, training, and knowledge of CCS's policies, it was not reasonably foreseeable that Kuizon would commit a criminal act. In considering a negligence claim brought against an employer for "failing to take reasonable steps" to prevent a rape by its employee, the Supreme Court of Michigan stated that "[e]mployers generally do not assume their employees are potential criminals, nor should they." *Brown*, 739 N.W.2d at 315, 318. In that case, the employer was informed on multiple occasions of its employee's "very crude, offensive sexual remarks" to the plaintiff leading up to the rape. *Id.* at 315. However, the court determined that the employer could not be held liable for the rape because the employee "did not commit prior acts that would have put his employer on notice of [his] propensity to commit rape and [his] workplace speech was not predictive of this criminal act . . . ." *Id.* at 314. The court noted that "not even plaintiff suspected that [the defendant's employee] would physically attack or rape her." *Id.* at 319. Because the defendant lacked notice that its employee might commit such an act, the court found that the defendant owed no duty to the plaintiff to prevent the rape from taking place. *Id.* at 316. In reaching this conclusion, the court stated that

> an employer can assume that its employees will obey our criminal laws. Therefore, it cannot reasonably anticipate that an employee's lewd, tasteless comments are an inevitable prelude to rape if those comments did not clearly and unmistakably threaten particular criminal activity that would have put a reasonable employer on notice of an imminent risk of harm to a specific victim.

*Id.* at 318. The court also stated that it declined to "transform the test of foreseeability into an 'avoidability' test that would merely judge in hindsight whether the harm could have been avoided." *Id.* at 318-19.

Like the employer in *Brown* who was not liable for its employee's criminal act, CCS is not liable for Kuizon's criminal conduct at the Jail because his criminal conduct was not reasonably foreseeable. CCS did not owe a duty to plaintiff to prevent the alleged sexual assault, battery, and harassment by Kuizon because CCS had no knowledge of Kuizon's prior inappropriate behavior. In addition to Holmes' testimony regarding her lack of notice, plaintiff testified that she and other inmates never reported Kuizon's conduct, and plaintiff thought his behavior while dispensing medication was "harmless." Pl.'s Dep. at 27-30, 33, 39, 75. CCS therefore had no reason to anticipate that Kuizon would engage in any sort of criminal activity; it had no "notice of an imminent risk of harm" to plaintiff. Regardless of whether the harm could have been avoided, the proper inquiry is whether the harm to plaintiff was foreseeable, and the Court finds that it was not. As a result, plaintiff's negligence claim against CCS fails.

### 2. *Gross Negligence*

Plaintiff's gross negligence claim against CCS also fails. This Court has determined that "[t]he Michigan Court of Appeals, previous opinions issued by this Court, and the United States District Court for the Western District of Michigan agree" that "[u]nder Michigan law, no 'gross negligence' cause of action exists." *Cramer v. Genesee Cty.*, No. 18-CV-10115, 2018 WL 2981628, at *5 (E.D. Mich. June 14, 2018) (footnotes omitted). "[G]ross negligence 'is not an independent cause of action,' but is rather a prerequisite which a plaintiff must establish when seeking to overcome a defendant's assertion of governmental immunity." *Hunter v. Joboulian*, No. 1:17-CV-832, 2018 WL 8369420, at *3 (W.D. Mich. July 6, 2018) (quoting *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011)), *report and recommendation adopted*, No. 1:17-CV-832, 2019 WL 1085300 (W.D. Mich. Mar. 7, 2019). CCS is therefore entitled to summary judgment on plaintiff's gross negligence claim in Count V.

***Conclusion***

   For the reasons stated above,

   IT IS ORDERED that the County's motion for summary judgment is granted as to the remainder of Count III of the complaint.

   IT IS FURTHER ORDERED that CCS's motion for summary judgment is granted as to Count V of the complaint.

          s/Bernard A. Friedman    
Dated: July 10, 2019      Bernard A. Friedman
    Detroit, Michigan     Senior United States District Judge